**Rosalie CULLEN, Plaintiff–Appellee,**

v.

**OLIN CORPORATION, Defendant–Appellant.**

No. 98–4277.

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1999.

Decided Oct. 25, 1999.

Rehearing Denied Nov. 30, 1999.

Ferne P. Wolf (argued), Carr, Korein, Tillery, Kunin, Montroy & Glass, East St. Louis, IL, D. Eric Sowers, St. Louis, MO, for Plaintiff–Appellee.

Mark G. Arnold (argued), Husch & Eppenberger, St. Louis, MO, Stephen W. Thomson, Thomson & Behr, Edwardsville, IL, for Defendant–Appellant.

Before COFFEY, FLAUM and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff–Appellee Rosalie Cullen ("Cullen") was forty-nine years of age and was employed by the Defendant–Appellant Olin Corporation ("Olin") as a manager of marketing administration when she was terminated in February of 1996 because, according to Olin, a Reduction in Force ("RIF") was necessary due to a turn in the economy.[1] Cullen brought suit against Olin alleging she was discharged, not because of any need for a RIF, but because of her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").[2] The case went to trial and the jury rendered a verdict finding that Olin had discriminated against the Plaintiff in violation of the ADEA. The trial judge entered judgment in favor of Cullen in the amount of $850,000, consisting of actual and liquidated damages, front pay, and attorney's fees. On appeal, Olin alleges that the Plaintiff presented insufficient evidence to support the jury's verdict and that the judge abused his discretion in admitting certain evidence. We vacate the judgment and remand for a new trial.

## BACKGROUND

For over 25 years, from March of 1969 thru February of 1996, plaintiff-appellee Cullen was employed by Olin at its Winchester Division in East Alton, Illinois,[3] as the manager of marketing administration. Cullen's position required that she: 1) function as a liaison between the Winchester Division and hunter education groups, youth groups, consumers, retailers and distributors (60–65% of her time); 2) procure promotional items and materials (10–15% of her time); 3) administer two buildings which housed the marketing department (10–15% of her time); 4) monitor the marketing department budget (5–10% of her time); and 5) occasionally perform special projects (5% of her time). The record also demonstrates that during the last few years of her employment, Cullen repeatedly received "superior" rankings in her performance reviews.

On December 5, 1995, Doug Cahill ("Cahill"), the president of the Winchester Division, met with Olin senior management and thereafter held a meeting with the salaried employees at the East Alton facility. Cahill advised the employees that the Winchester Division was in the midst of a financial downturn and warned that cost cutting and personnel reductions were inevitable. At trial, four former Olin employees who attended the Cahill meeting testified about additional remarks that they claim Cahill made, including statements that the older people at Winchester "were old fashioned and couldn't adjust to the changing times and that in the near future some of them would be gone" and that "older people have trouble with change and that they were gonna have to

---

1. In 1994, the Winchester Division earned $22.4 million on sales of $295 million. In 1995, sales dropped to $273 million and profit dropped to $4.7 million. Cahill forecasted a continued decline and in 1996, sales dropped to $225 million with the Winchester Division losing $5.8 million.

2. The ADEA makes it "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual

with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The protected class is employees forty years of age and over. *Id.* at § 631.

3. The Winchester Division is engaged primarily in the manufacture, distribution, and sale of sporting and military ammunition.

learn to go with the change or conform or they were going to be out." Another former employee testified that "[Cahill] gave the state of the business, so to speak, and where losses were and about equipment being antiquated and people being antiquated, that a lot of people didn't like to go with new procedures or updated things, and there would be a great many of us that was [sic] in that room at that time who would not be with Olin after the first of the year." Cahill denied making any statements concerning the age of Olin's employees or suggesting that older employees would be likely candidates for termination.

On February 6, 1996, as part of the RIF necessitated by the decline in ammunition sales, Cullen and seventy-three other Winchester Division employees were terminated. The RIF involved terminations in all but two departments and required a complete review of all the talents, skills, duties, and responsibilities of approximately 350 employees. To best implement the RIF, Cahill assigned the vice-presidents of each department to a committee known as "VAR".[4] The VAR committee prepared a list of employees recommended for termination. Vice-presidents were neither instructed to select any particular number of employees for termination, nor were they required to achieve any designated savings from each department. In fact, the vice-presidents were given neither written nor verbal guidelines upon which to base their decisions.

According to Harlan Kent ("Kent"), the vice-president in charge of the sales and marketing department (where Cullen was assigned), he was ultimately responsible for the decision to terminate Cullen. Kent also described the role Cahill played in the selection process. He stated that Cahill "set parameters for the general process of making the decisions ... in [the] respective departments" and Kent would update Cahill "on a regular basis as to the decisions he was making ..." but that Cahill "was not making those decisions *per se*."[5] Kent further testified that Cahill reviewed the personnel selections as part of the VAR.

At trial, Kent explained the process he utilized in selecting employees he chose to recommend for discharge. Initially, he testified that his strategy to cut costs in the marketing department was to implement a new organizational structure and assign the most appropriate and qualified personnel to the proper jobs within the newly created structure. The new organization eliminated Cullen's position as manager of marketing administration. Kent created two new positions for "event marketers" which were filled by Judy Eberhart and her associate Maryann Ventress (ages 43 and 42 respectively); two-thirds of Cullen's duties were reassigned to these two positions. Cullen's remaining duties were spread among other employees at Olin, contracted to outside agencies, or eliminated.

Cullen's case focused on attempting to establish that because of her age she was passed over for an event marketer position, and that Eberhart and Ventress were not as qualified as she was to perform in the newly created position. Kent testified that his decision to terminate the Plaintiff was based on direct discussions with her, interaction with her on the job, and discussions with her superiors. In contrast, Cullen testified that she only met with Kent

---

4. At Harlan Kent's deposition, which was read into the trial record, he testified that "VAR" stands for "value-added restructuring" but that it is "an acronym that could have meant many things. We essentially ... tried to come up with a code name so that when we had meetings it wasn't obvious what we were meeting on." Kent stated that the code name was created in the hopes "that people would focus on the day-to-day tasks and not be speculating about the possible future."

5. The record does not reveal whether Cahill ultimately reviewed Kent's decision to terminate Cullen or whether Kent's decision was final. But the resolution of this issue is unnecessary for this appeal.

on two occasions: 1) when she submitted a "booklet" detailing her goals and objectives in an attempt to inform Kent what her responsibilities included; and 2) on the date she was terminated. Kent further stated that he had not reviewed Cullen's personnel files. Kent testified that he chose Eberhart and Ventress over Cullen by examining "what jobs people had held and what were their skills and their experience." He believed that Eberhart and Ventress were better suited for the positions because they had "retail experience and selling experience," something that Kent believed necessary to be successful at the job. Cullen, on the other hand, "did not have that direct experience working with retailers." At trial, Cullen argued that these explanations were pretextual and covered up the real reason she was terminated: her age.

In support of her argument that Olin's reasons for her termination were pretextual, Cullen argued that she was more qualified than Eberhart. To prove her contention, Cullen pointed to the fact that she was rated as a "superior" employee even up to the date of her termination. She also produced numerous letters from conservation groups and youth hunter organizations which commended her on her performance with the Winchester Division. Cullen contrasted her performance evaluations with those of Eberhart, whose personnel file contained a memorandum, authored in August of 1995, wherein Eberhart memorialized a recent conversation with one of her supervisors. In the memo, Eberhart expressed her "extreme concern" over the events of the past few weeks after twenty-one years of "problem-free employment." While the memo does not describe "the events" Eberhart is referring to, she states that "a few minor comments were unnecessarily magnified . . . ." In addition, she wrote that her supervisor had "assured me that my reputation had not suffered because of the problems" and told her that she was not on probation and her future with Olin was not in jeopardy. This memorandum constitutes the only evidence containing adverse information in Ms. Eberhart's personnel files, prior to the date of the RIF and Cullen's termination. Furthermore, Kent stated that he had not seen Eberhart's memorandum at the time he made the decision to terminate Cullen and transfer Eberhart to the newly created "event marketer" position.

In addition to the memorandum and performance evaluations prepared prior to the February 6, 1995 reduction in force, Cullen introduced evidence of Ms. Eberhart's work-related problems which occurred following the RIF. Olin objected, both in pretrial proceedings and at trial, to the admission of any testimony or documents concerning Eberhart's post-RIF performance, on the ground that such evidence was irrelevant to Olin's state of mind in deciding to terminate Cullen. The district court rejected those objections, simply stating that "[o]ne theory advanced by the defense in this case, it is a theory for the jury to consider, is that [Eberhart] was better suited for [the event marketer position]. Now the jury can look at this and make up their own mind." The evidence admitted included a review of Eberhart's job performance written by Kent in May of 1996 wherein Kent stated that "well thought out analysis is lacking"; that Eberhart's understanding of financial analysis is "a major weakness"; and that she had a "tendency to bulldoze people." The review also discusses Eberhart's decision to accept an airline ticket from an Olin vendor, and mentions her statement that she should be "less naive about the fact that outside vendors could try to bribe me." In November of 1996, Eberhart was placed on probation because of: 1) problems in the telemarketing department which she supervised; 2) the airline ticket incident; and 3) two instances of Olin customers yelling at Eberhart on the telephone.

Following a four-day trial, the jury rendered a verdict for Cullen in the amount of

322

$850,000 in damàges and attorney's fees. Olin appeals.

## ISSUES

Olin contends that: 1) the Plaintiff failed to present sufficient evidence of age discrimination to support the jury verdict against Olin; and 2) the trial court abused its discretion in allowing Cullen to present evidence of Eberhart's performance following the RIF.

## DISCUSSION

### A. Circuit Rule 30

■ Under Circuit Rule 30(b)(1), as amended December 1, 1997, the appellant has the unambiguous duty to include in the Appendix "all opinions, orders, or oral rulings in the case that address the issues sought to be raised." In this case appellant's counsel failed to comply with Circuit Rule 30 when he failed to attach the district court's ruling concerning motions in limine as well as the trial judge's final evidentiary ruling. To add insult to injury, counsel falsely certified that he complied with Circuit Rule 30. We have repeatedly warned appellants and their counsel that failure to follow the clear requirements of Rule 30 is subject to appropriate sanctions. *E.g., Pabst Brewing Co. v. Corrao,* 161 F.3d 434, 438 n. 1 (7th Cir.1998); *Hibben v. Nardone,* 137 F.3d 480, 481 n. 1 (7th Cir.1998); *Tangwall v. Stuckey,* 135 F.3d 510, 515 (7th Cir.1998); *Hill v. Porter Mem. Hosp.,* 90 F.3d 220, 225–27 (7th Cir.1996). Failure to attach the necessary documents impairs the ability of the court to thoroughly consider all issues raised, for "[w]e cannot consider arguments that the lower court was incorrect and should be reversed if the written orders and transcript pages containing the appealed decisions are not before us." *Hill,* 90 F.3d at 226. Accordingly, we are issuing an order to show cause why appellant's counsel should not be sanctioned for his disregard of this circuit's rules.

### B. Evidence at Trial

■ Olin argues that the evidence presented at trial was legally insufficient to support a judgment for Cullen on her age discrimination claim. We review *de novo* a trial court's denial of a motion for judgment as a matter of law. *See Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1043 (7th Cir.1999). We have recently stated that "[a]ttacking a jury verdict is a hard row to hoe[,]" and we will reverse the verdict only if there is "no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Id.* 173 F.3d at 1043. In other words, we will overturn the jury's verdict only if "no rational jury could have found for the plaintiff." *Emmel v. Coca–Cola Bottling Co.,* 95 F.3d 627, 629 (7th Cir.1996). "We apply this standard stringently in discrimination cases, where witness credibility is often crucial." *Collins v. Kibort,* 143 F.3d 331, 335 (7th Cir.1998) (quoting *Williams v. Pharmacia, Inc.,* 137 F.3d 944, 948 (7th Cir.1998)).

Initially, we note that four of the witnesses at trial testified about age-related remarks Cahill made in his December 5, 1995, address to salaried employees. According to those witnesses in attendance, Cahill stated that some Winchester employees were "old fashioned," "couldn't adjust to the changing times," and "in the near future some of them would be gone." He further said that "older people have trouble with change and that they were gonna have to learn to go with the change or conform or they were going to be out." We have held that "an employer statement that reveals hostility to older workers" may constitute evidence of age discrimination, *see Castleman v. Acme Boot Co.,* 959 F.2d 1417, 1420 (7th Cir.1992), and a reasonable jury could have believed these four witnesses, as well as disbelieved Cahill's denials of making these statements, and concluded that Cahill targeted older employees for termination.

■ Defendant Olin argues that Cahill did not decide to terminate Cullen, rather Kent did. Thus, Olin contends that even if

we accept the fact that Cahill made age-disparaging remarks, he was so far removed from the selection process that his remarks do not show that age motivated Cullen's discharge. Of course, "a statement must relate to the motivation of the decision-maker responsible for the contested decision[,]" *Rothman v. Emory Univ.*, 123 F.3d 446, 451 (7th Cir.1997) (internal citations omitted), and isolated comments that amount to no more than "stray remarks" will not suffice. *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989) (citation omitted).

At trial, the Plaintiff elicited testimony that Cahill, the president of the Winchester Division, decided that personnel cutbacks were necessary, set the parameters for the RIF, and reviewed the vice-presidents' personnel decisions. In addition, Cahill testified that he participated in a number of the VAR meetings involving the group of vice-presidents who developed the list of employees suitable for termination.

In addition to Cahill's remarks, Cullen introduced further evidence that she was fired because of her age. Virtually all of Cullen's duties were taken over by younger employees, ranging in age from thirty-two to forty-three years of age. This fact, combined with undisputed proof that Cullen's performance ratings were consistently in the "superior" category, and the statements made by Cahill, permitted a jury to reasonably infer that age constituted a factor in Olin's decision to discharge her. The totality of these factors convince us that a reasonable jury could have found that Cahill's age-related remarks were causally related to the decision to terminate Cullen, and could have allowed a rational jury to conclude that age played a role in Cullen's termination.

## C. Eberhart's Performance Following the RIF

We are very concerned by the trial judge's decision to admit evidence of Eberhart's poor performance in her new position subsequent to the February 6, 1996 RIF. At trial, the Plaintiff attempted to introduce Eberhart's entire personnel file, including evaluations and other documents containing reviews of her performance, some of which were drafted following the RIF. One document, a May 1996 review of Eberhart conducted by Kent, concluded that "well thought out analysis is lacking"; that Eberhart's understanding of financial analysis is "a major weakness"; and that she had a "tendency to bulldoze people." Moreover, as stated previously, the review mentions Eberhart's decision to accept an airline ticket from an Olin vendor, and includes her comment that she needed to become "less naive about the fact that outside vendors could try to bribe me."

In November 1996, eight months after the RIF, Kent placed Eberhart on probation. This fact is memorialized in a written memorandum from Eberhart and addressed to Kent wherein Eberhart explained her "side of the story" regarding the problems leading up to him placing her on employment probation. The memo discusses problems in the telemarketing department which she supervised; the airline ticket incident which Eberhart labeled "pure stupidity on my part"; and two instances of Olin customers "screaming" at Eberhart over the telephone. The memo concludes with Eberhart writing "I apologize for the fact that you have lost faith in me.... I hope that you will give me the benefit of a doubt and a second chance."

Both pre-trial and at trial, Olin objected on relevance grounds to the introduction of "those portions of the exhibit[s] that have documents that discuss Ms. Eberhart's performance after the RIF." The district court overruled the objections, reasoning that the jury should be allowed to consider whether Eberhart "was better suited for [the event marketer] job that resulted from the RIF." On appeal, Olin argues that admission of the post-RIF evaluations constitutes an abuse of discretion because at the time of the RIF, Olin could not have predicted that Eberhart would later suffer

from below par performance. Moreover, Olin argues, Cullen's ADEA suit "does not turn on whether Ms. Eberhart was in fact better qualified than Plaintiff, but whether Olin honestly believed that Ms. Eberhart was better qualified" *at the time it selected her for termination,* not months afterwards. Olin further contends that the admission of this evidence was prejudicial because the post-RIF evidence was the best evidence of Eberhart's deficiencies, and throughout the trial Cullen repeatedly pointed to Eberhart's deficiencies to prove that Cullen was more qualified than Eberhart for the event marketer position, and thus another factor, age, must have motivated Olin.

◼ We review the trial court's admission of evidence for an abuse of discretion. *See Matter of CLDC Management Corp.,* 72 F.3d 1347, 1353 (7th Cir.1996). In *McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 356, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), the issue was "whether all relief must be denied when an employee has been discharged in violation of the ADEA and the employer later discovers some wrongful conduct [occurring before the employee was discharged] that would have led to [a lawful] discharge if it had been discovered earlier." The Supreme Court ruled that the Plaintiff was entitled to seek relief under the ADEA because Plaintiff's "misconduct was not discovered until after she had been fired. The employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason." *Id.* at 359–60, 115 S.Ct. 879. Olin points out that *McKennon* is the mirror image of the case *sub judice,* and we agree. Eberhart's performance evaluations given *after* plaintiff-appellee Cullen was terminated cannot be relevant to demonstrate what Olin believed *at the time Cullen was terminated.* In other words, Eberhart's unsatisfactory performance months after the reduction in force had no bearing on management's

state of mind at the time the decision to terminate Cullen was made, and thus that evidence is totally irrelevant to a determination of whether Cullen was terminated in violation of the ADEA. In the words of our highest court, Olin "could not have been motivated by knowledge it did not have. . . ."

◼ The plaintiff-appellee Cullen argues that even if the trial court abused its discretion in admitting the post-RIF documents, the error was harmless because the evidence did not have a "substantial and injurious effect or influence in determining the jury's verdict." *See Williams,* 137 F.3d at 951 (citations omitted). We disagree with Cullen's contention. In opening argument, Plaintiff's counsel read virtually the entire text of the disputed documents to the jury, in the context of demonstrating that Eberhart had problems performing her new job responsibilities after Cullen was gone. Moreover, the contents of the documents were discussed in Plaintiff's cross-examination of Kent and another Olin representative, and at one point Cullen's counsel even corrected a witness and insisted in open court that statements in the documents were made *after* the RIF. Finally, Plaintiff's closing argument asserted that Eberhart had "botched this event marketing job so badly" after Cullen left, that Olin had to rehire a former employee to handle the accompanying duties. Throughout the trial, one of the Plaintiff's primary themes was that Eberhart was less qualified than Cullen, and thus Cullen must have been terminated because of her age. We are convinced that the most compelling and supportive evidence used to establish Cullen's point was contained in evaluations and memoranda created as a result of Eberhart's questionable activities following the RIF and Cullen's termination. Because the post-RIF evidence was irrelevant to the reasons Olin terminated Cullen, it should not have been admitted, and

its admission was prejudicial.[6]

## CONCLUSION

Because we hold that the Plaintiff submitted sufficient evidence to support the jury verdict, we decline to reverse the judgment on that ground. But, since the district court abused its discretion in admitting evidence of Eberhart's performance following the RIF, and that evidence was prejudicial, we VACATE the judgment and REMAND the case to the district court for a new trial. As stated previously, we are also issuing an order to show cause why appellant's counsel should not be sanctioned for his disregard of Circuit Rule 30.

---

**6.** This is not to say that the documents could not have been redacted to eliminate all refer-ence to post-RIF evaluations and then admitted properly into evidence.