In the

# United States Court of Appeals

## For the Seventh Circuit

No. 00-2696

RICHARD N. SHICK,

*Plaintiff-Appellee,*

v.

ILLINOIS DEPARTMENT OF HUMAN
SERVICES, AS SUCCESSOR TO THE
ILLINOIS DEPARTMENT OF PUBLIC AID,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 98-4353—**G. Patrick Murphy**, *Chief Judge.*

ARGUED JUNE 5, 2001—DECIDED OCTOBER 9, 2002

Before FLAUM, *Chief Judge*, and MANION and ROVNER,
*Circuit Judges.*

MANION, *Circuit Judge.* Richard Shick, armed with a
sawed-off shotgun, robbed a convenience store in Joliet,
Illinois. At the time, he was employed as a case worker
at the Illinois Department of Public Aid. After the rob-
bery, he sued the Department, claiming that he was dis-
criminated against because of his disabilities and his
sex, and that the discrimination and treatment resulting
from it caused him such trauma that he committed the

robbery. A jury concluded that the Department did discriminate against him because of his disabilities and sex, and awarded him $5 million in damages and $166,700.00 in back pay. Because the Seventh Circuit ruled that the ADA was not a valid abrogation of the states' Eleventh Amendment immunity, the district court vacated the disability judgment and then capped the judgment for sex discrimination at $300,000.00. The court then awarded $303,830.00 in front pay. The Department appeals. We reverse and remand.

## I.

The evidence most favorable to Richard Shick, which is what we must consider since he was the successful party below, *Sheehan v. Donlan Corp.*, 173 F.3d 1039, 1043-44 (7th Cir. 1999), is taken primarily from his own testimony and exhibits at trial. Shick, who was 52 at the time of trial, was the youngest of eight children. He grew up in a poor but stable family, graduated from high school, and after a couple of short-term jobs, joined the Army in 1966, when the Vietnam war was heating up. His first duty tour was in Holland where he met his wife. They have been married for over 30 years. He interrupted his service to acquire a college degree in 1977. After a successful 20-year career in the Army, where he received several commendations and rose to the high enlisted rank of Master Sergeant, he retired. He proceeded to work in various jobs, and in 1990 he was hired as a case worker in the Marshall, Illinois office of the State Department of Public Aid. While in the Army, he incurred two disabilities: hearing loss due to his proximity to a loud explosion, and permanent intestinal bleeding from exposure to some disease while serving in Italy. Despite these maladies, during his first four years at the Department Shick performed his job well and en-

joyed his work. But on August 8, 1994, when Susan Yargus was hired as administrator for the Marshall office, things changed dramatically. As Shick testified at trial, "We just seemed to butt heads all the time." Apparently the tension began right away. In a three-page single-spaced interoffice memo dated September 8, 1994, just one month after Yargus arrived, Shick had some critical observations about Yargus's policies on break-time, phone calls, work priorities, office procedures, and Yargus's lack of management experience. In the ensuing weeks and months, a number of other memos and meetings occurred, many challenging Yargus's unfair treatment of Shick.

The unfairness that Shick referred to permeated the two-year period that Yargus supervised the office prior to his departure. Much of the controversy concerned her insensitivity to his disabilities, and her unequal application of office rules concerning break-time, smoking and eating. When Yargus arrived in August 1994, Shick's disabilities were multiple. In addition to the intestinal bleeding and hearing loss, an injury to his left eye caused almost complete loss of vision and his other eye, originally the weakest, required additional surgery and significant medication. The eye condition caused serious pain and headaches. He also developed carpal tunnel syndrome in both arms, which required operations and two leaves of absence, each lasting several weeks. In addition, because of sleep apnea, he needed rest, preferably a nap, during his half-hour lunch break. He was also tall and overweight and preferred a particular chair. And he had occasional problems with his teeth. For each of these problems, he needed some accommodation.

The medical situation that appeared to generate the most conflict at the office was the intestinal disease that caused internal bleeding and required frequent trips to

the bathroom. He claims that Yargus was suspicious of his bathroom habits, and thought he was exaggerating the need in order to create opportunities for additional break-time when he could smoke. According to Shick, Yargus occasionally banged on the bathroom door because he was in there too long and she insisted that he obtain a letter from his doctor stating that the frequent bathroom use was necessary due to his condition. Since he was the only man in the office, Shick had exclusive use of the employee's men's bathroom (although some of the women claimed they snuck in there for occasional smoke breaks as well). In order to mitigate his fatigue from sleep apnea, he had a sleeping bag on the bathroom floor so he could nap during his lunch break. Yargus made him remove it.

When he needed batteries for the headset that amplified phone conversations, Yargus delayed replacing them so he had to buy them himself. She also moved a copy machine and printer near his desk, creating noise that further interfered with his already-impaired hearing. She had his favorite chair replaced with one that he had to adjust many times per day. There was also evidence that Yargus required Shick to administer his eye-drops at his desk (as opposed to allowing him to use the restroom for that purpose) because she suspected him of using that time to also take a smoking break.

Although the office obtained an additional computer terminal, at least partially to accommodate his carpal tunnel syndrome, Yargus assigned it to a female caseworker who supposedly had seniority. Although Shick did take extensive leaves for operations, one for an eye procedure and two for carpal tunnel syndrome, he also requested authorization for a number of one- or two-day leaves to address other medical problems, but Yargus often resisted. He also asserted that in addition to Yargus, those higher

in the chain of authority were also not sufficiently accommodating to his disability needs.

In addition to Yargus's insensitivity to his medical problems, Shick claims that she treated him less favorably than female caseworkers. She strictly enforced his time for taking breaks, while she was much more lenient with the women. In fact, Shick kept a detailed log of the break-time for his female coworkers to prove to Yargus that their breaks were longer, but Yargus refused to recognize it. She occasionally criticized him for eating at his desk at inappropriate times, while the women were not corrected for doing the same. And the women caseworkers were each assigned their own (albeit small) offices, while his desk was in the open near Yargus's office where "she could keep an eye on him." She occasionally made other negative comments about men. Shick attributed these negative feelings to the serious conflicts she encountered with her husband in her recent divorce.

In 1992, before Yargus came on board, Shick began working for an outside business selling metal buildings. When Yargus arrived, she pressured him to cease all business-related calls while at work, but when another female caseworker's husband was out of town, she did not object to that caseworker taking his calls.

As time passed, Shick's medical problems increased, especially the problems with his eyes and carpal tunnel syndrome. At the same time he was becoming more and more depressed about his job because of the way Yargus treated him. Early in 1996 he wrote Janet Wilson, the Department's EEO director, to complain about Yargus's discriminatory treatment. Wilson eventually called back, but at the time Shick was on sick leave. When he returned, Wilson was apparently on leave. He also claims that he received the phone message late. When he did call in July he

discovered that Wilson had done very little to advance the investigation of his complaints. At that point, he concluded that no one in State government was going to take care of his problems.

On July 22, 1996, Shick sent a memo to Yargus stating, "I have had a lot worse pain in my eye the last few days and am taking large doses of pain medication so I can work . . . . I may act a little spacy as both keep me sick in my stomach also. I'll try not to take any more time off." He testified that he made the "time off" promise "because there was a lot of conflict. I was having a lot of time off because of all of the operations and there was a lot of conflict on whether it was needed or not." Also, at this point, Shick was having what he described as mental problems. He sought help "higher in the chain of command" in the State to no avail. He "talked to the union because they had a program to help people that were having mental problems." He also talked to a local doctor about it to get help. Nothing seemed to work. At that point he was "terribly depressed" and was having "panic attacks" which hurt his work. He was also "terribly angry" with Yargus. So he decided to seek help at the EEOC office in Chicago. He made an appointment and Yargus approved his request for a leave of absence for Monday, August 26, 1996.

The night before his appointment he traveled to Joliet, Illinois and stayed with his nephew. In the morning he drove to the EEOC office in Chicago. He was on time for his 9:00 a.m. appointment, but it was not until the afternoon that they finally met with him to discuss his case. At that point he was crying, and although sympathetic, the intake personnel said that it would be a year and a half to two years before they could do anything for him. With that he claims he was "devastated" because he hoped

for a resolution much sooner and he dreaded returning to his job with Yargus in charge. He left Chicago. He was taking heavy medications for both his depression and his eye problems. He "cried all the way from Chicago and ended up in Joliet" where his nephew lived. Although he was familiar with the area, he got lost and could not find his nephew's house. At that point he recalls nothing until he found himself in jail. He has no recollection of how he got there, but it turns out that he robbed a White Hen convenience store of about $200 while brandishing a sawed-off shotgun.[1] The psychiatrist who testified on his behalf, Dr. Lyle Rossiter, originally examined Shick in August 1997 at the request of his criminal defense attorney. Dr. Rossiter indicated that for several months before the robbery Shick suffered from a major depression. This "highly stressed-out state" was caused both by his job difficulties as well as his many physical ailments. On the day of the offense he experienced severe pain along with the depres-

---

[1] Shick explained his reason for possessing the sawed-off shotgun. Years before, when he and his wife arrived home, they interrupted a burglary. Burglars were unloading some property through a window. When discovered, the burglars escaped, but in the process they dropped several items, including Shick's shotgun. The burglars ran over the abandoned shotgun and bent the barrel. Rather than discard the shotgun, Shick decided to salvage it by cutting off the bent part of the barrel and the broken part of the stock, leaving a sawed-off shotgun. He carried it in his car because he needed protection for the occasions when he carried large amounts of money. He sometimes carried as much as $25,000 in cash generated by his building business. Also he occasionally gambled, and he would have anywhere from $20,000-$40,000 and he needed protection for that. Since he stored the gun in the trunk of his car, it was with him when he made the trip to Chicago.

sion, and was taking a combination of strong medications that could have had a significant impact on his mental condition. Dr. Rossiter opined that Shick "suffered a disassociative disorder on the day of the offense. He shut out, in this case, access to the ordinary moral ideals and constraints of conscience that had regulated his conduct for 50 years." Dr. Rossiter testified that the discriminatory treatment that Shick received from Yargus was in effect "the straw that broke the camel's back" and caused him to commit the extraordinary act of robbing the convenience store. In any event, Shick was arrested and eventually convicted of armed robbery and sentenced to 10 years in prison

In the meantime, immediately after the robbery, Shick was suspended from his job. After a grievance with the union failed to lift the suspension, Shick decided to resign so he could be replaced pending the long criminal trial process (it took almost three years) rather than impose his work on coworkers during his absence.

Shick had been in prison for eight months when the trial at hand took place. The jury found the Department liable for disability and sex discrimination, and awarded Shick $5 million "for past and future emotional pain, suffering, inconvenience, and mental anguish." It also assessed lost past earnings in the amount of $106,700.00. Because the Seventh Circuit in *Erickson v. Board of Governors*, 207 F.3d 945 (7th Cir. 2000), held the Americans with Disabilities Act is not a valid abrogation of states' Eleventh Amendment immunity, the district court vacated the ADA verdict. The sex discrimination award was capped at $300,000. The court awarded back pay, attorneys' fees and $303,830 in front pay for the 12 years he could have worked until he reached age 65, even though it included the time he will spend serving his 10-year sentence. The court denied the

Department's motion for a new trial, and the Department appeals.

## II.

On appeal the Department raises three issues. Primarily, the Department charges that the district court abused its discretion when it refused to order a new trial on Shick's Title VII count (sex discrimination). Because the jury heard extensive evidence concerning disability-based discrimination, once the court dismissed the ADA count, given the prejudicial effect of the inadmissible evidence, the Department claims the court should not have allowed the verdict on sex discrimination to stand. And, the Department further asserts, even if the Title VII verdict were to remain in place, the district court also abused its discretion by awarding Shick front pay for the time (ten years) he was sentenced to prison. Finally, the Department requests a new trial based upon a recent change in state law which would estop Shick from claiming that his supervisor's treatment caused him to commit the armed robbery.

## A.

Regarding the first issue, essentially what the Department wants is a new trial confined to the issue of sex discrimination. Although it is unusual, it is not unheard of for a jury in a civil trial to render a verdict of liability on two separate claims and then after trial for the district court to dismiss one of the counts. Theoretically, if there is sufficient evidence for the jury to have found liability on the remaining count, in this case sex discrimination, the trial court has the discretion to preserve the jury verdict even though the jury heard significant and presumably prejudicial evi-

dence that would not be admissible under the surviving count. Thus, the question before us is whether the trial court abused its discretion by not awarding a new trial. *Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 606 (7th Cir. 2000).

Under Federal Rule of Civil Procedure 59, in deciding whether to grant a new trial the district court must determine whether "the verdict is against the weight of the evidence, the damages are excessive [or insufficient], or if for other reasons the trial was not fair to the moving party." *Briggs v. Marshall*, 93 F. 3d 355, 360 (7th Cir. 1996) (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 516 (7th Cir. 1993)). Clearly the question here is whether the trial was unfair to the Department given the extensive and damaging evidence on disability discrimination that has likely been rendered inadmissible post-trial. A new trial may be granted in the event of an error in the admission of evidence in extraordinary situations. A court should only grant a new trial if the improperly admitted evidence had "a substantial influence over the jury," and the result reached was "inconsistent with substantial justice." *Agushi v. Duerr*, 196 F.3d 754, 759 (7th Cir. 1999) (citing *Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997)). *See also* Fed.R.Civ.P. 61 ("No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."). Our cases hold that "evidentiary errors satisfy this standard only if a significant chance exists that they affected the outcome of the trial." *Hasham v. California State Bd. of Equalization*, 200 F.3d 1035, 1048 (7th Cir. 2000).

We considered a situation similar to the case at hand in *Cullin v. Olin Corp.*, 195 F.3d 317, 324-25 (7th Cir. 1999),

where, although the plaintiff had submitted enough evidence to support the jury's verdict on his ADEA claim, we vacated the decision and remanded because the trial court had improperly admitted irrelevant and highly prejudicial evidence. *Id.* In that case, the prejudicial evidence consisted of poor employee evaluation forms for the employee who had replaced the plaintiff after the reduction in force (RIF) that had resulted in the plaintiff's dismissal. *Id.* Because the evaluations were completed post-RIF they played no part in the decision to terminate the plaintiff and therefore were irrelevant. Because the irrelevant and highly prejudicial evidence was discussed often throughout the trial and was, in fact, some of the most compelling evidence offered in support of the plaintiff's case, the case was remanded for a new trial to be conducted without reference to the replacement employee. *Id.* at 325 n.6.

In this case we face a similar issue in that the most compelling evidence of Yargus's abuse was not in fact due to Shick's sex, but because of his disabilities. This case differs procedurally in that these evidentiary issues were not raised through a Rule 403 motion at trial because at the time, the prejudicial evidence was directly relevant to the then valid claim under the ADA. However, once Shick's ADA claim was dismissed the Department raised the issue of the effects of this prejudicial, and now largely irrelevant, evidence through its motion for a new trial.

While unusual procedurally, this case is also unusual because the plaintiff claimed and the jury apparently believed that Shick was driven to commit an armed robbery because of the abusive treatment by his supervisor, Susan Yargus. In effect, he was relying on a theory similar to one made popular by comedian Flip Wilson: "The devil made me do it." After hearing all of the evidence, the jury initially awarded Shick five million dollars—this after he

had been convicted and had begun serving a 10-year prison sentence. This steep verdict demonstrates the extraordinary impact of the disability discrimination evidence because, while it is clear that Shick and Yargus had an acrimonious relationship (to say the least), the hostilities were primarily caused by Yargus's callous attitude about Shick's several disabilities—not his gender.

Admittedly, there was some evidence of sex discrimination, but a thorough review of the trial testimony and the more than 100 exhibits presented discloses that most of the evidence and testimony focused on Shick's disabilities and Yargus's treatment of Shick regarding those disabilities. For instance, Shick's own testimony at trial is replete with descriptions of how Yargus treated him in relation to his health problems.[2] As earlier noted, the most frequent confrontations involved his intestinal bleeding and her insensitivity to his bathroom needs. His hearing problems were exacerbated when she placed his desk near a noisy machine, and when she did not provide batteries for his hearing aid. Yargus removed his sleeping bag from the bathroom where he napped to remedy his sleep apnea. She complained of his frequent absences for doctors' appointments and extended leaves for eye and carpal tunnel syndrome operations. He testified that his many

---

[2] To reiterate, Shick's physical problems included: hearing loss that required hearing aids; intestinal bleeding requiring frequent trips to the bathroom as well as doctors' appointments; sleep apnea requiring noontime naps in the men's bathroom; back and teeth problems caused by a "crash in an elevator;" carpal tunnel syndrom in both arms requiring absences for operations; obesity requiring his preference for a special chair; vision problems—he was nearly blind in one eye, and had severe pain in the other requiring medication and frequent treatment; depression and heavy medication at the time of the robbery.

health problems, coupled with Yargus's negative attitude about his treatments and accommodation for these problems, caused him great stress and left him very depressed and discouraged about his job.

Additionally, Shick's medical expert, Dr. Rossiter, testified about the circumstances that led up to Shick's commission of the armed robbery, stating that Shick was suffering from a major depression for a number of months prior. This "highly stressed-out state" was significantly caused by his job circumstances as well as his "ongoing medical conditions that were quite serious." He described the "accumulated stress from these medical illnesses, [and] the severe pain on the day of the offense." He also described the variety of medications prescribed, including some "that can alter one's state of consciousness, alter one's state of mind." The doctor opined that Shick "suffered a disassociative [dis]order on the day of the offense. He shut out, in this case, access to the ordinary moral ideals and constraints of conscience that had regulated his conduct for 50 years." The doctor added that "the single factor that distinguished his emotional state in 1996 from his emotional states in prior years, under different circumstances, was the peculiar relationship between him and Susan Yargus." He described Shick's "feelings of being helpless and hopeless, despairing, and at the same time very driven by his own increasing anger, not just mild resentment but rage, at her for the sense of unfairness." In addition to this testimony, of the 100-plus exhibits placed in evidence at trial, the vast majority concerned conflicts and disputes regarding his various disabilities and their impact on him and his performance at the workplace.

Without question, there was some evidence, when taken in the light most favorable to Shick, of sex discrimination. Of the five employees in this particular office, Shick was

the only male. Before Yargus arrived, he was performing his job satisfactorily and he liked the work that he was doing. However, on September 8, 1994, a little over a month after Yargus arrived, Shick sent her a three-plus-page memo that was confrontational and critical. Many other memos followed back and forth, some complaining about Yargus's favorable treatment of the women over him on things such as break time, eating at the desk, taking medications at the desk, and use of the telephone for business and personal calls. But the record, including the testimony and the exhibits, clearly demonstrates that the occasions of sex discrimination are minuscule compared to the many conflicts involving his medical problems and disabilities.[3] Dr. Rossiter described the severe depression and ultimate rage as resulting from Shick's conflict with Yargus, and explained that he believed that this

---

[3] On appeal, the Department does not challenge the sufficiency of the evidence as to the jury's verdict on sex discrimination. However, on remand, it may be that after all of the evidence of disability discrimination falls out, the remaining evidence fails to rise to the level of an adverse employment action, as required by Title VII. *See Traylor v. Brown*, 295 F.3d 783 (7th Cir. 2002) (explaining that because Title VII only prohibits discrimination with respect to the "terms, conditions or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), an employee must suffer a materially adverse employment action to recover, and summarizing the "adverse action" requirement). Similarly, it may be that the evidence of sex discrimination fails to reach the level necessary to constitute a constructive discharge. *See Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (summarizing case law in which an employer's unpleasant and embarrassing actions were found insufficient to support a constructive discharge claim). Those issues are better left to the district court on remand after the evidence of disability discrimination is sorted out.

drove Shick to commit the armed robbery. It is hard to imagine how a jury would have accepted this extraordinary theory for which it initially awarded Shick five million dollars, without the extensive testimony about the abusive treatment regarding his many ailments. Rather, the jury had to be very sympathetic to Schick's many maladies and his efforts and needs to cope with them. At the same time, the jury had to be extremely irritated with what it perceived to be Yargus's insensitivity and even harsh attitude about these many medical challenges. This reaction has everything to do with disability discrimination and very little to do with sex discrimination.

While it is true that the trial judge has great discretion in determining whether to grant a new trial, given the overwhelming evidence of the abusive treatment regarding Shick's disabilities and the prejudicial effect of this evidence, the limited evidence of sex discrimination was tainted beyond repair, absent a new trial. Moreover, given the jury's initial damages award of five million dollars, we must conclude that this evidence had "a substantial influence over the jury." *Palmquist*, 111 F.3d at 1339; *see also Agushi*. 196 F.3d at 759. Accordingly, we conclude that the district court abused its discretion in denying the Department a new trial on Shick's sex discrimination claim following its reversal of judgment on Shick's ADA claim, since most, if not all, of the evidence on disability discrimination became inadmissible.

## B.

The trial court, having reached the conclusion that there was no basis for granting a new trial, went on to award Shick damages for sex discrimination. It capped the award at the statutory ceiling of $300,000. The court also

awarded front pay in conjunction with the jury's verdict on sex discrimination. The Department acknowledges that if the jury found liability for sex discrimination, front pay could be appropriate for the time between Shick's resignation and his subsequent conviction and incarceration, but claims that Shick is not entitled to front pay while he is serving his prison sentence. The court recognized that once in prison, Shick could not work so the Department normally "shouldn't have to pay for that," but the court also noted that Yargus's treatment was "the reason he went to prison in the first instance and lost his job." Since she drove "this poor fella [nuts] and the jury believed it," the district court awarded front pay in the amount of $303,830.00, which covered the time until Shick would reach age 65, including the time he will spend in prison.

Front pay is an appropriate remedy in Title VII cases when reinstatement is not available or not advisable because of workplace incompatibility. *Williams v. Pharmacia*, 137 F.3d 944, 951 (7th Cir. 1998). As a substitute for reinstatement, front pay is designed to compensate discrimination victims for the reasonable time it would take to find comparable employment elsewhere. *Id.* at 953-54. But front pay is only designed to compensate a plaintiff from the lost earnings from his old job for as long as he "may have been expected to hold it." *Id.* Thus, if the employee obtains another job, those earnings are deducted from front pay. Here Shick could not have spent any more time with his employer due to his conviction, and obviously there is no chance that Shick would find any work, much less comparable work once he was incarcerated. Thus, a front pay award encompassing prison time would be inappropriate, as returning to his job would have been impossible for reasons apart from the strained relationship that existed with his employer.

Moreover, the district court's decision in awarding Shick front pay is fundamentally flawed for another reason—as a matter of law, the Department's actions were not the proximate cause of Shick's conviction and incarceration. Yet, the district court concluded that because the "jury found that Plaintiff's criminal conviction was the proximate result of the wrongful conduct of Defendant's agent, Susan Yargus, . . ." it would not deny Shick front pay on the basis of his conviction. Given the jury's five million dollar verdict, it seems clear that the jury held Yargus responsible for Shick robbing the White Hen, and his subsequent imprisonment. However, under general tort principles governing causation which apply equally to Title VII, a plaintiff may only recover damages proximately caused by the defendant's conduct. *See, e.g., Hamilton v. V.E. Rodgers*, 791 F.2d 439, 444 (5th Cir. 1986) (plaintiff's burden in Title VII case is to prove harassment proximately caused injury), abrogated on other grounds by *Harvey v. Blake*, 913 F.2d 226 (5th Cir. 1990). While generally the issue of proximate cause is a jury question, in extreme circumstances, such as the one at bar, the question of proximate cause is an issue of law properly resolved by a court. *See Suzik v. Sea-Land Corp.*, 89 F.3d 345, 350 (7th Cir. 1996); *Collins v. American Optometric Assoc.*, 693 F.2d 636, 642 (7th Cir. 1983). In this case, as a matter of law, Shick's own act of using a sawed-off shotgun to rob a convenience store constituted a superseding intervening cause for his later conviction and incarceration. *See Restatement of Torts* (Second) § 440 ("A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."); *Restatement of Torts* (Second) § 441 ("An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed."); *Prosser & Keeton*

*on Torts* § 44 at 312 (defendant is not liable for damages caused by intentional or criminal acts which no defendant could foresee). *Cf. Hamilton*, 791 F.3d 444 (plaintiff's estate failed to prove defendant's harassment was the proximate cause of the plaintiff's death). Accordingly, Shick cannot recover from the defendants for damages resulting in his conviction and incarceration whether in the form of front pay, pain and suffering, or emotional distress. Moreover, the extent of emotional injury attributable to the defendant for Shick's breakdown is questionable too, as Shick's own expert testified that his mental condition was caused by both Yargus's conduct and his own physical ailments, and Shick's expert blamed some of Shick's mental condition on the medication he was taking, testifying that the combination of strong medications could have had a significant impact on his mental condition. *See Merriweather v. Family Dollar Stores of Ind., Inc.*, 103 F.3d 576, 580 (7th Cir. 1996) (where employer's discriminatory action only partially responsible for emotional harm, damages must be reduced accordingly). On remand, these issues should be more fully explored, as well.

Finally, the Department asserts that a change in Illinois law since the trial should be applied retroactively, thus requiring a new trial. In *American Family Mutual Insurance Co. v. Savickas*, 739 N.E.2d 445 (Ill. 2000), the Illinois Supreme Court held that a criminal conviction may have a collateral estoppel effect in a civil case such as this. Based on *Savickas*, the Department further argues that Shick would have been barred from introducing testimony from his expert to the effect that Yargus caused Shick to commit the robbery. However, because we have already ruled that the Department is entitled to a new trial and that as a matter of law the Department cannot be liable for damages stemming from Shick's conviction and incarceration, and thus this evidence would be inadmis-

sible for that reason, we need not consider the impact of *Savickas* in this case.

## III.

After the jury initially awarded Shick five million dollars for his claim against the Department of Human Services for disability and sex discrimination, the district court properly vacated the disability judgment but let stand the judgment on sex discrimination. Because the extensive evidence on disability discrimination had a substantial influence on the jury, thus making the trial unfair to the Department if the judgment on sex discrimination was left intact, we vacate the judgment and remand for a new trial consistent with the principles set forth in this opinion. Rule 36 shall apply on remand.

ROVNER, *Circuit Judge*, dissenting.  The civil trial in this case progressed on the theory that the discrimination at the workplace led to Shick's mental illness and his constructive discharge. According to the unrefuted expert testimony, he experienced a dissociative disorder in which he shut out access to the ordinary moral ideals and constraints of conscience that had regulated his conduct for 50 years. The trial testimony portrayed the robbery as an act fundamentally inconsistent with Shick's life prior to that date, which included twenty years in the army during which time he received numerous commendations, a thirty-year marriage, good work history, and no prior history of any criminal action. The jury agreed that the dis-

crimination led to his mental illness and constructive discharge, returning separate verdict forms on disability discrimination and gender discrimination.

On appeal, IDHS stressed in its brief that it does not contest the sufficiency of the evidence to support the verdict on gender discrimination. In fact, IDHS concedes that the trial record supports the verdict and the damages on the gender discrimination claim. The majority's suggestion to the contrary in footnote 3 is therefore inconsistent with the views of the trial court and the parties themselves, and the record supports their contention that the verdict was supported by sufficient evidence.

IDHS sought a new trial not because the evidence of gender discrimination was insufficient to support the verdict, but because the evidence relating to the ADA claim was, in retrospect, inadmissible and was unfairly prejudicial. The trial court rejected this argument, quoting IDHS' own representations earlier that the evidence of disability and gender discrimination were "inextricably intertwined," and therefore that the same evidence would be introduced in a trial based solely on gender discrimination. We review a trial court's denial of a new trial only for abuse of discretion. *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 424 (7th Cir. 2000). It is because of that highly-deferential standard of review that I am compelled to dissent. We are not at liberty to second-guess the trial court's decision solely because we might have ruled otherwise. Without a doubt, this appears to be a bizarre verdict and damage award. But we were not there, we did not view the witnesses as did the trial judge, and we are not in the same position to assess the impact of the disability evidence on the trial as a whole. The jury and trial court were there, and the trial court agreed with the jury that the evidence was sufficient to prove gender discrim-

ination. The trial court also determined, from its unique vantage point, that much of the damaging evidence would have been admissible in a trial on gender discrimination alone, and therefore that a new trial was not warranted. On reviewing the record, I cannot conclude that the trial court abused its discretion in that determination. Although some evidence introduced at trial related solely to the disability discrimination, there was substantial overlap in evidence for the two types of discrimination.

For instance, throughout the trial, Shick introduced evidence that his use of time was closely scrutinized, and that he received forms of discipline for violations that were ignored when engaged in by the other employees, all of whom were women. Testimony in relation to that allegation included evidence regarding the close monitoring of his bathroom breaks. He asserted that his use of the bathroom was necessitated by his disability, and thus the testimony related to his disability discrimination claim. It also was relevant, however, to his claim of gender discrimination, because his supervisor interpreted the bathroom breaks as an attempt to take extra smoking breaks, but similar long breaks or use of the restroom for smoking went unchecked for the female employees. In this and many other instances, testimony was relevant to both allegations of discrimination. It is perhaps a concession to that overlap that IDHS never sought to sever the two claims in the initial trial, even though the potential prejudicial effect was present in that trial as well. The evidence on retrial of the gender discrimination claim would largely track the evidence admitted in this trial. Viewing the evidence as a whole, it simply was not an abuse of discretion for the trial court to hold that the evidence relating to the ADA claim was not so prejudicial as to require a new trial. Because IDHS did not argue that the front pay award was invalid based on the lack of proxi-

mate cause, I would not reach that issue given my views on the request for a new trial, although I understand the court's desire to reach it in light of the remand where the issue may arise again. I respectfully dissent.

A true Copy:

      Teste:

                            _____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*