In the
United States Court of Appeals
For the Seventh Circuit

Nos. 98-1020 and 98-1095

REGINA SHEEHAN,

Plaintiff-Appellee, Cross-Appellant,

v.

DONLEN CORPORATION,

Defendant-Appellant, Cross-Appellee.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 97 C 685--Morton Denlow, Magistrate Judge.

Argued September 24, 1998--Decided March 18, 1999

 Before CUMMINGS, BAUER and DIANE P. WOOD, Circuit
Judges.

 CUMMINGS, Circuit Judge.  Regina Sheehan was five
months pregnant with her third child when she was
fired by her employer, Donlen Corporation
("Donlen"), leading to this lawsuit under the
Pregnancy Discrimination Act, 42 U.S.C.
sec.2000e(k). Donlen is a family-owned business
with about 100 employees that leases vehicles to
corporate clients. Sheehan was hired in July
1991. She had previously worked for some other
employers, but had not reported them all on her
resume or application to Donlen.

 A year after she started, Sheehan became
pregnant with her first child. Donlen did not
then have an official maternity policy. Decisions
about retention after maternity leave were made
on a case-by-case basis. Zeno Wisniewski, her
then-supervisor in the Customer Service
Department, told her that he would not hold her
job open when she went on maternity leave, but
Donlen President Gary Rappeport countermanded
this decision, telling Sheehan she was a
"treasured employee." Sheehan's 1992 performance
evaluation rated her overall as "meeting
requirements" or better, although she had had
some conflict with Steve Anderson, another
employee in the department. Wisniewski spoke to
her about this difficulty but nonetheless wrote
in her evaluation that Sheehan "sometimes comes

across a bit tough to deal with, but [this is] merely perception rather than reality."

On her return in September 1992, Sheehan was placed as an accounts manager in the Purchasing Department, where her duties mainly involved arranging the purchase of vehicles from dealers. Sheehan's supervisor, Eileen Kelm, rated Sheehan as "meeting or above requirements" in her 1993 performance evaluation, in all areas except "teamwork," with respect to which there were personal conflicts with two other employees in Purchasing who had complained to several managers about Sheehan's abrasiveness.

In spring 1993, about six months after taking up the Purchasing assignment, Sheehan became pregnant with a second child. A few months later, she reported the pregnancy to Kelm and to Kelm's boss, Brad Miller. Kelm expressed concern about how Sheehan's work would be done while she was on maternity leave, and Kelm indeed had to put in extra time during Sheehan's six-week leave in January and February 1994. This leave was covered by a newly instituted maternity policy at Donlen. On her return, Sheehan remarked on the volume of work and said, "Maybe I should go home and have another baby." Kelm said to her, "If you have another baby, I'll invite you to stay home."

In the spring of 1994 Sheehan became pregnant once more. She informed Kelm and the new Purchasing Department head Bill Graham in June. Kelm said, "Oh, my God, she's pregnant again." Sheehan went on disability leave for three weeks, which was burdensome to Kelm. On Sheehan's return in July, Kelm shook her head at Sheehan and said, "Gina, you're not coming back after this baby." That month Sheehan was also placed in a "performance matrix," a management tool to improve employee productivity by setting goals and measuring performance. She was the only employee in her department placed in this program and was chosen because her job objectives were easily measurable. Sheehan expressed some concern to Kelm and to Graham that the goals had been set entirely by Kelm, without her participation. Kelm was upset that Sheehan had gone over her head to Graham and told him so.

It is unclear precisely when the decision to fire Sheehan was made. Donlen claims that a decision was made in June by Graham, Kelm, and Suzanne Gutowski, Donlen's human resources director, before any of them knew of her third pregnancy. But Sheehan and Donlen agree that those three people made a final determination in August 1994, when they knew she was pregnant. The firing was a mutual decision among these managers. Graham put off the firing until fall

because he "needed her services during the busy summer season," when many businesses need cars.

On September 13, 1994, Graham told Sheehan that she was fired, saying, "Hopefully this will give you some time to spend at home with your children." Donlen claims that Graham told Sheehan the decision had been made because Sheehan was confrontational. The following day, however, Graham told Sheehan's co-workers in Purchasing that she had been fired because "[w]e felt that this would be a good time for Gina to spend some time with her family." Graham had fired only one other employee before then, Towanda Starling, who was also pregnant. Donlen continued Sheehan's health insurance through the birth of the third child. Sheehan remains at home with her three small children, having found no other work.

After obtaining her right-to-sue letter from the EEOC, Sheehan filed the employment discrimination lawsuit we now consider, asking nearly $700,000 in damages. It was tried by consent before Magistrate Judge Morton Denlow pursuant to Fed. R. Civ. P. 73, exercising jurisdiction under 28 U.S.C. sec. 636(4)(c)(1). A jury found Donlen liable for violation of the Pregnancy Discrimination Act/1 and awarded her $30,000 in back pay. The trial court entered judgment for Sheehan in that amount, also giving her $76,913.40 in attorneys' fees ($4,350.40 for her first attorney and $72,563.00 for the firm that took over the case), and $10,000.00 in miscellaneous costs and interest, for a total of $116,913.40. At trial and after entry of the judgment, Donlen moved for judgment as a matter of law, Fed. R. Civ. P. 50, arguing that the evidence was legally insufficient. Donlen also challenged the trial court's refusal to consider Donlen's after-acquired evidence defense. Donlen appeals on these issues and on grounds of abuse of discretion in awarding attorneys' fees. Sheehan cross-appeals the trial court's ruling that she failed to mitigate her damages and asks us to enter judgment for her in the amount of $98,000 for lost wages and benefits. We affirm the judgment of the trial court.

I.

Donlen argues that the evidence presented at trial was legally insufficient to support judgment for Sheehan on liability for pregnancy discrimination. Our standard of review for a trial court's denial of judgment as a matter of law is de novo. Sokol Crystal Products, Inc. v. DSC Communications Corp., 15 F.3d 1427, 1433 n.2 (7th Cir. 1994). To warrant judgment as a matter of law because of legal insufficiency of evidence, there must have been "no legally

sufficient evidentiary basis for a reasonable jury to find for the non-moving party." Payne v. Milwaukee County, 146 F.3d 430, 432 (7th Cir. 1998). Attacking a jury verdict is a hard row to hoe. In assessing whether there was such a reasonable basis after a trial on the merits, this Court considers whether the totality of the evidence supports a verdict of intentional discrimination. Whether the plaintiff has made a prima facie case drops away after trial. Diettrich v. Northwest Airlines, Inc., No. 97-2831, 1999 WL 69667, at *4 (7th Cir. Feb. 16, 1999). We will not disturb the jury verdict unless Donlen can show that "no rational jury could have brought in a verdict against [it]." EEOC v. G-K-G, Inc., 39 F.3d 740, 745 (7th Cir. 1994). Our inquiry "is limited to whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed," Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 629 (7th Cir. 1996) (internal citations omitted)--here, most favorable to Sheehan.

In this case, the jury was presented with two radically different stories. According to Donlen, Sheehan was a contentious, difficult, rude, uncooperative, and argumentative employee, someone who regularly drove other employees to complain to management about her behavior and even reduced another employee to tears, and those are the reasons she was fired. Sheehan herself maintains that she was an acknowledgedly capable employee whose apparent roughness around the edges was tolerable but whose pregnancies, illegally, were not. The jury might rationally have believed Donlen, but it did believe Sheehan. There was a "reasonable basis in the record for [that] verdict." Accordingly, "we will not reweigh the evidence but will let the verdict stand." Knox v. State of Indiana, 93 F.3d 1327, 1332 (7th Cir. 1996).

Evidence of discrimination may be direct or circumstantial. Graham's remarks to Sheehan and to her co-workers at the time of the firing that she would be happier at home with her children provided direct evidence of discrimination, "evidence which in and of itself suggests" that someone with managerial authority was "animated by an illegal employment criterion." Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997). Even isolated comments may constitute direct evidence of discrimination if they are "'contemporaneous with the discharge or causally related to the discharge decision making process.'" Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 723 (7th Cir. 1998) (internal citations

omitted). Direct evidence typically "relate[s] to the motivation of the decisionmaker responsible for the contested decision." Chiaramonte v. Fashion Bed Group, Inc., 129 F.3d 391, 396 (7th Cir. 1997). Graham had managerial authority over Sheehan. His comments were contemporaneous with her firing. They related to his motivation for the decision. A reasonable jury might have accepted them as direct evidence of discrimination.

Graham did not actually state in so many words that Sheehan's pregnancy was a reason for firing her, but direct evidence of discrimination does not require "a virtual admission of illegality." Venters, 123 F.3d at 973. It would cripple enforcement of the employment discrimination laws to insist that direct evidence take the form of an employer's statement to the effect that "I'm firing you because you're in a protected group." Evidence of discriminatory motives must, it is true, have some relationship with the employment decision in question. Inappropriate but isolated comments that amount to no more than "stray remarks" in the workplace will not do. Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563, 569 (7th Cir. 1989) (citing Price Waterhouse v. Hopkins, 490 U.S. 228). However, "remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination," even short of an admission of illegal motivation. Id.; see also Miller v. Borden, Inc., 1999 WL 55152, at *3 (7th Cir. Feb. 8, 1999); Robinson v. PPG Indus., Inc., 23 F.3d 1159, 1164-1165 & nn.2-3 (7th Cir. 1993); Shager v. Upjohn Co., 913 F.2d 398, 402 (7th Cir. 1990).

Likewise, a remark need not explicitly refer to the plaintiff's protected status (here pregnancy) for a reasonable jury to conclude that it is direct evidence of illegal motivation based on that status. Cf. Venters, 123 F.3d at 973 ("But the evidence need not be this obvious to qualify as direct evidence."). A reasonable jury might conclude that a supervisor's statement to a woman known to be pregnant that she was being fired so that she could "spend more time at home with her children" reflected unlawful motivations because it invoked widely understood stereotypes the meaning of which is hard to mistake.

We note with respect to stereotypes that pregnancy discrimination law is no different from other sorts of anti-discrimination law, despite Donlen's assertion to the contrary. This Court said long ago that in Title VII, "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." Sprogis v. United Air

Lines, Inc., 444 F.2d 1194, 1198 (7th Cir. 1971) (emphasis added). Discrimination on the basis of pregnancy is part of discrimination against women, and one of the stereotypes involved is that women are less desirable employees because they are liable to become pregnant. This was one of Congress' concerns in passing the Pregnancy Discrimination Act. See Amending Title VII, Civil Rights Act of 1964, S. Rep. No. 95-331, 95th Cong., 1st Sess. at 3 (1977); Prohibition of Sex Discrimination Based on Pregnancy, H.R. Rep. No. 95-948, 95th Cong., 2d Sess. at 3 (1978) ("As the testimony received by this committee demonstrates, the assumption that women will become pregnant and leave the labor market is at the core of the sex stereotyping resulting in unfavorable disparate treatment of women in the workplace.").

Finally, a reasonable jury would not be required to accept a proffered innocent construction of the remarks we are discussing, even if it might rationally have done so. See, e.g., EEOC v. Century Broadcasting Corp., 957 F.2d 1446, 1457 (7th Cir. 1992). In that case we held that a supervisor's statements, for example, that a radio station wanted "new young sound" would support a conclusion of age discrimination, though the remarks might reasonably be subject to an "innocent" interpretation. Id.

The circumstantial evidence in this case, like that in Futrell v. J.L. Case, 38 F.3d 342 (7th Cir. 1994) (age discrimination), though perhaps insufficient taken piece by piece, "[in] sum d[oes] permit a reasonable inference of discrimination." Id. at 346. The circumstantial evidence includes the comments of Sheehan's direct supervisor Eileen Kelm: "If you have another baby, I'll invite you to stay home"; "Oh, my God, she's pregnant again"; and, "Gina, you're not coming back after this baby." A rational jury need not have accepted innocuous constructions of these remarks offered by Donlen, for example, that Kelm was joking. See Century Broadcasting, 957 F.2d at 1457. In view of Kelm's frustration at dealing with the volume of work during Sheehan's pregnancy leaves and Kelm's generally good evaluations of Sheehan's work, it would have been reasonable for a jury to infer that Kelm, a decisionmaker in Sheehan's termination, agreed that Sheehan was to be fired not because of personality conflicts or dissatisfaction with Sheehan's work, but because she burdened Kelm with pregnancies and maternity leaves.

The circumstantial evidence also includes the fact that the only other employee Graham had fired was also a pregnant woman, Towanda Starling. That Graham had not fired several women

who did become pregnant goes only to the weight accorded this fact and does not show that the jury was irrational to conclude that he did fire Sheehan because she was pregnant.

Donlen's version of the story is that Sheehan was fired because she was a difficult employee and not because she was pregnant. The problems with this version are serious enough that a rational jury might have disbelieved Donlen. "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511. See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1123 (7th Cir. 1994) (reading Hicks as adopting a pretext-only and not a pretext-plus rule). We have said in regard to Hicks: "[I]mplicit in the [Supreme] Court's holding is the notion that once the employee has cast doubt on the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury--not the court." Weisbrot v. Medical College of Wisconsin, 79 F.3d 677, 681-682 (7th Cir. 1996).

A reasonable jury might have wondered, for example, why Donlen placed Sheehan in the performance matrix to evaluate and improve her productivity in July 1994 if, as Donlen claims, her supervisors had decided to fire her in June, supposedly before they knew she was pregnant. Likewise a rational jury might have found the claim about the date of the decision hard to square with human resources director Gutowski's testimony that the decision was made in "approximately August." A rational jury might have found it hard to credit Donlen's proffered reason for the decision, Sheehan's purported abrasiveness and confrontational character, in view of Gutowski's testimony, as to mitigation, that plaintiff was qualified for and should have applied for jobs requiring "strong interpersonal customer relations skills," "positive attitude," "outgoing personality," and a "pleasant service-oriented attitude." And a rational jury might have been troubled by inconsistencies in Kelm's testimony as to whether there had been any specific complaints about Sheehan's demeanor or in Graham's testimony as to whether Sheehan had been argumentative with him or with Kelm or whether Kelm had indeed complained to him about Sheehan. These questions might raise in the mind of a rational jury the "suspicions of mendacity" which, together with the prima facie case Sheehan has certainly made, the Supreme Court has indicated might themselves suffice to show

intentional discrimination. Hicks, 509 U.S. at 511.

Since a rational jury might well have credited Sheehan's version of the story over Donlen's on the grounds set forth above, we reject Donlen's claim that there can be no other explanation for the verdict in Sheehan's favor but jury sympathy. That sort of argument is in any case disfavored. It is a bad sign for a litigant when she feels impelled to argue from "jury sympathy" in the absence of specific, concrete, credible evidence. Such an argument is often an indication of desperation. Our system of civil justice differs from the British and continental models, where juries are not used in civil cases, in being based on the idea that "the jury is well-equipped to evaluate the evidence and use its good 'common sense' to come to a reasoned decision." Richardson v. Richardson-Merrell, Inc., 857 F.2d 823, 833 (D.C. Cir. 1988). As Chief Justice Thomas Cooley of Michigan remarked over a century ago:

The jurors, and they alone, are to judge of the facts, and weigh the evidence. The law has established this tribunal, because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities, and take what may be called a "common-sense view" of a set of circumstances, involving both act and intent, than any single man, however pure, wise, and eminent he may be.

People v. Garbutt, 17 Mich. 9, 27 (1868) (quoted in United States ex rel. Toth v. Quarles, 350 U.S. 11, 18 n.10). Tocqueville observed in 1835 that the jury plays an essential role in a democracy, legitimating outcomes and educating the people in the law. See 1 Alexis de Tocqueville, Democracy in America 334, 337 (Schocken ed., 1st ed. 1961) (quoted in Powers v. Ohio, 499 U.S. 400, 407) (The jury is a body that "invests the people . . . with the direction of society. . . . [It is] one of the most efficacious means for the education of the people which society can employ."). For all these reasons--the long-established role of and respect for the jury in the American system of civil justice, together with the sound basis in policy upon which it is premised--there are high barriers to defeating a jury verdict properly rendered.

We decline to make an exception for employment discrimination cases. We have said that there is no basis for imposing "stricter scrutiny" of jury verdicts in employment discrimination cases than

others because juries in such cases are purportedly "especially sympathetic to plaintiffs in those cases." G-K-G, 39 F.3d at 745. "The suggestion that the scope of appellate review should vary with the judge's assessment of the probable direction of jury bias has no basis in established law, and if a party wants us to innovate, it had better give us a [more] solid[ ] foundation than suspicion." Id. In fact, we have said that an appeals court must be "particularly careful in employment discrimination cases to avoid supplanting [its] view of the credibility or the weight of the evidence for that both of the jury (in its verdict) and the judge (in not interfering with the verdict.)." Emmel, 95 F.3d at 630 (internal citations omitted). "It is the jury's job to weigh the evidence, not ours." Knox, 93 F.3d at 1337. We are not "some kind of superjury, from whom losing parties can get a second bite at the apple." Id. at 1336. Accordingly, we decline to enter judgment as a matter of law in favor of the defendant Donlen Corp. on grounds of legal insufficiency of the evidence.

II.

 Donlen also appeals the trial court's ruling that Donlen's after-acquired evidence defense failed as a matter of law. Under this defense, after-acquired evidence of an employee's misconduct may limit damages. See McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 361-362. An employer may be found liable for employment discrimination, but if the employer later-- typically in discovery--turns up evidence of employee wrongdoing which would have led to the employee's discharge, then the employee's right to back pay is limited to the period before the discovery of this after-acquired evidence. Id. at 361. Donlen argued that Sheehan had falsified her job application by leaving several jobs off her resume and not explaining that she had been fired from one of them. Sheehan would have been fired when the company became aware of these facts, Donlen said, and so Donlen should not be liable for backpay from the date of their discovery. We review the determination of the trial court on the after-acquired evidence issue de novo, Willis v. Marion County Auditor's Office, 118 F.3d 542, 545 (7th Cir. 1997), but we review the trial court's factual findings for clear error. Fed. R. Civ. P. 52(a).

 In deciding the motion against Donlen, the trial court reasoned, first, that there was no falsification. It found that the application and the resume were separate documents and the omissions were made only on the resume, no job history at all being provided on the application;

and, moreover, that there was no evidence Sheehan had been fired from those jobs. This factual finding is not clearly erroneous, that is, it is not one that leaves "'the reviewing court on the entire evidence . . . with the definite and firm conviction that a mistake has been committed,'" whether or not the finding is one we would necessarily have made ourselves. Anderson v. City of Bessemer, N.C., 470 U.S. 564, 573 (internal citations omitted). The record will sustain the interpretation the trial court placed on the facts surrounding the application and the resume.

The trial court reasoned, second, that there was no causation, since it was not disputed that no one in the history of Donlen had ever been fired for falsification of a resume. If Donlen cannot show by a preponderance of the evidence that the after-acquired evidence would have led to her termination, it has not made out the defense. See McKennon, 513 U.S. at 362-363. As the Ninth Circuit has said, "the inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not." O'Day v. McDonnell-Douglas Helicopter Corp., 79 F.3d 756, 759 (9th Cir. 1996). "Proving that the same decision would have been justified . . . is not the same as proving that the same decision would have been made." Price Waterhouse, 490 U.S. at 252. In absence of further evidence that the policy actually would have been applied, Donlen's adversion to its stated policy is therefore insufficient to carry its burden of persuasion on the after-acquired evidence defense.

III.

Donlen appeals the trial court's award of $72,563.00 in attorneys' fees to Sheehan's law firm. We review the award of attorneys' fees for abuse of discretion. Hennessy v. Penril Datacomm Networks, Inc., 69 F.3d 1344, 1351 (7th Cir. 1995). A trial court is given "wide discretion" in fashioning reasonable attorneys' fees. Alexander v. Gerhart Enterprises, Inc., 40 F.3d 187, 194 (7th Cir. 1994). Two requirements must be met for the plaintiff to recover attorneys' fees in a civil rights case. First, the plaintiff must be the "prevailing party," which requires that a plaintiff obtain at least some relief on the merits, see Farrar v. Hobby, 506 U.S. 103, 109, a condition which is clearly met here by the $30,000 jury verdict for Sheehan. Second, the attorneys' fees awarded must be reasonable. See Alexander, 40 F.3d at 194. Donlen's arguments that Sheehan's are not reasonable boil down to

the claims that her attorneys billed too many hours at too high a rate given the simple nature of her claim and that she recovered about a third of what she now appeals for. In view of the great scope of discretion for the trial court and "the desirability of avoiding frequent appellate review of what are essentially factual matters," Leffler v. Meer, 936 F.2d 981, 984-985 (7th Cir. 1991), Donlen's argument that the trial judge abused his discretion is unpersuasive.

Plaintiff's attorneys did a thoroughly professional and able job in a difficult sort of case. We do not fault the quality of Donlen's representation. A case like this can go either way. Nonetheless, a plaintiff risks the likelihood, given the low success rate of employment discrimination cases,/2 of bearing her own attorneys' fees and at least the possibility of being stuck with the employer's attorneys' fees. It is, therefore, rational, and so reasonable, for a plaintiff to encourage her attorneys to be thorough. The district judge's review of the factual circumstances, which already involved some reduction of these fees, supports our conclusion. We find no abuse of discretion. Donlen's argument that Sheehan's attorneys' fees should be reduced because Sheehan's damages were much smaller than she hoped is meritless. This court has repeatedly rejected the notion that the fees must be calculated proportionally to damages. Alexander, 40 F.3d at 194; Wallace v. Mulholland, 957 F.2d 333, 339 (7th Cir. 1992). The principle applies equally to purported disproportionality between the relief requested and that received.

IV.

Sheehan cross-appeals the trial court's denial of her motion for judgment as a matter of law on Donlen's affirmative defense that she failed to mitigate her damages. Failure to mitigate is an affirmative defense. The employer bears the burden of persuasion, EEOC v. Gurnee Inn Corp., 914 F.2d 815, 818 (7th Cir. 1990), and must show that the plaintiff was not reasonably diligent in seeking other employment and that there was a reasonable chance that plaintiff might have found a comparable position. Wheeler v. Snyder Buick, 794 F.2d 1228, 1234 (7th Cir. 1986). Sheehan presented uncontroverted evidence that she suffered $98,000 in damages, but she was awarded only $30,000.

Once again we review the judgment de novo and consider whether, on the totality of evidence, a rational jury could have arrived at the challenged verdict. See Emmel, 95 F.3d at 629. Sheehan found no other employment in the three

years between her termination at Donlen and the trial. She was an undisputedly qualified employee with a long and hitherto substantially unbroken work history. Evidence was given that comparable jobs were available. A rational jury had a legally sufficient basis to conclude that Sheehan failed to mitigate her damages. It might rationally have believed that she had done so, but it apparently did reasonably believe that she had not.

Affirmed.

FOOTNOTES

/1 The key relevant provision of the Act states: "[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . . " 42 U.S.C. sec. 2000e(k).

/2 "[T]he success rate for employment discrimination plaintiffs nationwide was only twenty-two percent . . . [a] percentage [that] has remained relatively constant into the 1990s. . . . [I]n most tort-type cases, [by contrast], plaintiffs tend to approximate a success rate . . . of [about] fifty percent." Michael Selmi, The Value of the EEOC: Reexamining the Agency's Role in Employment Discrimination Law, 57 Ohio St. L.J. 1, 41 (1996).