Brassard, Raymond J., J.
INTRODUCTION
The plaintiff, Lisa Sivieri (“Sivieri”), brought this action against the defendant, the Commonwealth of Massachusetts, Department of Transitional Assistance (the “DTA”) seeking damages for gender discrimination (Count I); hostile environment sexual harassment (Count II); retaliation (Count III); and breach of contract (Count IV).[1] Count III of the complaint was dismissed on June 26, 2003 (MacLeod, J) (16 Mass. L. Rptr. 531). The matter is before the court on the DTA’s Motion for Summary Judgment. For the following reasons, the DTA’s motion is ALLOWED in part and DENIED in part.
BACKGROUND
The facts, viewed in the light most favorable to the plaintiff, are as follows.[2] In 1997, Sivieri began working for the DTA as a paralegal specialist in the Administrative Disqualification Unit (the “ADU”) responsible for prosecuting welfare fraud. The work involved a variety of tasks and activities, including receiving and reviewing reports, interviewing case workers about recipients possibly receiving benefits illegally, and preparing case files and appearing on behalf of the DTA at hearings regarding recipient eligibility. Sivieri quickly learned the functions of the position and her job performance was consistently evaluated as satisfactoiy or better. In her January 2001 performance evaluation, Sivieri was rated overall as “exceeds expectations.” She received regular salary increases and within a year and a half was entrusted with more responsibilities, including training new hires in the unit.[3]
Within the first ten months of her employment with the DTA, Sivieri married and began thinking about starting a family. In July of 1999, when Sivieri was about five months pregnant, she applied for a position as a Training Paralegal in response to a posting by the DTA. She was interviewed for the position but was not selected and the job was given to another paralegal in the unit whom Sivieri had helped train, Cynthia Sullivan (“Sullivan”). Sullivan had worked for the DTA for less than a year and had no children.[4] On November 30, 1999, Sivieri gave birth to a daughter, Olivia.
Although Sivieri had noticed a negative attitude in the ADU towards women with small children, including a failure to promote them, she did not recognize the extent of the negativity or react to it until after her own child was born. Sivieri’s supervisors and managers often made negative remarks about women with young children. When Sivieri was denied extended maternity leave, a manager, Al Furoli, told her that he didn’t have children but “he c[ould] understand how it is to leave a small child at home.” Sivieri’s direct supervisor, Debra Graham (“Graham”), commented frequently about the negative effects of having women employees bearing children. Such comments included Graham repeatedly stating, with respect to the ADU’s workload, that the unit would remain effective “as long as nobody else g[ot] pregnant.”[5] None of the comments made by Sivieri’s supervisors were sexual in nature.
In the spring of2000, Sullivan was promoted to EBT supervisor and was again promoted in the spring of 2001 to Compliance Manager. Other paralegals in the unit who had been hired after Sivieri and been trained by her also received transfers or promotions; in May of 2001, Kristin Naugler (“Naugler”) was promoted to the Lead Paralegal position and in November of 2001, Judy Coloumbe (“Coloumbe”) was promoted to a Quality Control position and was allowed to transfer to an office closer to her home.[6] At the time of their promotions, Coloumbe had no children and Naugler had an eleven-year-old daughter.
After Naugler was given the Lead Paralegal position, Sivieri asked Graham why she had been repeatedly passed over for promotion. Graham said that the arrival of Sivieri’s child had led the ADU managers to conclude that she no longer sought promotion. Graham also stated that she was surprised Sivieri was upset at not getting promoted considering her family obligations at home.[7] With regard to why Sullivan and Coloumbe were promoted over Sivieri, Graham stated that they could put in extra hours at the end of the week, which Sivieri took to be a reference to the fact that neither Sullivan nor Coloumbe had small children.
After Sivieri questioned why she was not promoted, she was subjected to increased management scrutiny; her decisions were constantly second-guessed, her work was heavily criticized and sent back for her to redo, and her responsibilities were curtailed.[8] This scrutiny, coupled with the DTA’s negativity towards women with small children, caused Sivieri emotional *98 and psychological distress and she began experiencing a range of physical symptoms. She also postponed having a second child, which caused strain in her marriage. On Februaiy 20, 2002, upon the advice of her physician and counselor, Sivieri requested to be selected for a voluntary layoff from her employment with the DTA. As a condition of the DTA agreeing to her request, Sivieri executed a “Waiver of Right to Appeal Selection for Layoff.” In that document, Sivieri acknowledged that she waived “any and all right to appeal [her] selection for layoff... in any forum.”
Sivieri filed a complaint with the Massachusetts Commission Against Discrimination (“MCAD”) on November 13, 2001.[9] After leaving her position with the DTA in Februaiy of 2002, Sivieri removed her MCAD complaint to this court on May 20, 2002. On or about October 2, 2002, the DTA filed a motion to dismiss. On June 26, this court dismissed Count III of the plaintiffs complaint, finding that Sivieri’s retaliation claim was barred by her failure to allege retaliation in her MCAD complaint. Sivieri’s claim for breach of contract has been withdrawn.
DISCUSSION
I. Standard of Review
A court should grant summary judgment where the record, including pleadings, depositions, answers to interrogatories, admissions on file and affidavits, shows that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); McGuinness v. Cotter, 412 Mass. 617, 620 (1992). The court must construe facts in the light most favorable to the non-moving party. Id. The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17. A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Flesner v. Tech. Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
II. Gender Discrimination
1. Timeliness of Claims
The DTA contends that Sivieri’s claims are barred by c. 15 IB’s limitation period. At the time Sivieri filed her MCAD complaint, G.L.c. 151B, §5 provided that “[a]ny complaint filed pursuant to this section must be so filed within six months after the alleged act of discrimination.”[10] Sivieri filed her complaint on November 13, 2001. Therefore, Sivieri is barred from seeking relief for any alleged acts of discrimination occurring prior to May 13, 2001, unless those acts were part of a continuing violation. See 804 CMR 1.10(2) (c. 15 IB’s limitations period “shall not be a bar to filing in those instances where facts are alleged which indicate that the unlawful conduct complained of is of a continuing nature”).[11] For the continuing violation doctrine to apply, a plaintiff must prove that: “(1) at least one discriminatoiy act occurred within the six month limitations period; (2) the alleged timely discriminatoiy acts have a substantial relationship to the alleged untimely discriminatoiy acts . . . [and] (3) earlier violations outside the six-month limitations period did not trigger [the plaintiffs] ‘awareness and duly’ to assert [her] rights.” Ocean Spray Cranberries, Inc. v. Massachusetts Comm’n. Against Discrimination, 441 Mass. 632, 642 (2004), citing 804 Code Mass. Regs. § 1.03(2). A plaintiffs “awareness and duty” is triggered when she “knew or could have formed a reasonable belief that the earlier violations were discriminatoiy.” Id. at 644, n.16.
Sivieri appears to have been denied two promotions within the six-month limitations period provided by c. 15IB, the promotion to Lead Paralegal given to Naugler in May of 2001 and the promotion to Quality Control given to Coloumbe in November of 2001.[12] While these rejections for promotion do have a “substantial relationship” to Sivieri’s prior rejections, Sivieri acknowledged in her deposition that she was aware of the DTA’s pattern of refusing to promote women with small children “pretty early on,” prior to her application for the Training Paralegal position in 1999. Therefore, Sivieri knew or could have formed a reasonable belief that the promotion denials occurring prior to May 13, 2001 were discriminatoiy at the time they occurred and the continuing violation doctrine does not apply. Accordingly, any claims pertaining to those events are time-barred. Those events, however, may still be used as background evidence to support the surviving claims. Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 530 n.10 (2001) (“plaintiff who has a seasonable claim may use events that occurred prior to the six-month limitation period as background evidence . . . even though she cannot recover damages for the time-barred events”).
2. Application of Chapter 151B, §4
Under G.L.c. 151B, §4, it is unlawful:
[flor an employer, by himself or his agent, because of race, color, religious creed, national origin, sex, sexual orientation . . . genetic information, or ancestiy of any individual to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification.
*99 Sivieri alleges that the DTA discriminated against her based on a gender stereotype; namely, the belief that a woman cannot be both a good mother and a committed worker. The DTA asserts that such discrimination, if it occurred, was based on parental status, not sex, and that parents are not a protected class under c. 151B. Whether an employment decision based upon stereotypes about a mother’s role in the workplace constitutes sex discrimination is a matter of first impression in the Massachusetts courts. Because the term “sex” is not defined in the statutory framework of c. 15IB, the court will look to case law, both in Massachusetts and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), the equivalent federal civil rights legislation, for guidance in applying the law to the instant case. See Dahill v. Police Department of Boston, 434 Mass. 233 (2001). Although the court “is not bound by Federal precedent interpreting an analogous Federal statute, [it] may appropriately consider that precedent as useful guidance.” See College-Town, Div. of Interco, Inc. v. Massachusetts Comm’n Against Discrimination, 400 Mass. 156, 162 n.3, 163-64 (1987), quoting Massachusetts Elec. Co. v. Massachusetts Comm’n Against Discrimination, 375 Mass. 160, 167 (1978).
A. Stereotyped Statements as Evidence of Discriminatory Animus
The Supreme Court has held that “stereotyped remarks” can be evidence of gender discrimination. Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989). In Price Waterhouse, Hopkins, a female manager in an accounting firm, was denied partnership after she failed to conform to gender stereotypes. During the review process, “[o]ne partner described her as ‘macho’; another suggested that she ‘overcompensated for being a woman’; [and] a third advised her to take ‘a course at charm school.’ ” Id. at 235. Hopkins was also told that “in order to improve her chances for partnership . . . [she] should ‘walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jeweliy.’ ” Id. The Court found that “[i]t takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring ‘a course at charm school.’ Nor . . . does it require expertise in psychology to know that, if an employee’s flawed ‘interpersonal skills’ can be corrected by a soft-hued suit or a new shade of lipstick, perhaps it is the employee’s sex and not her interpersonal skills that has drawn the criticism.” The Court concluded that Price Waterhouse had discriminated against Hopkins by permitting such stereotyped attitudes to play a role in its decision not to promote her to partner. Id.
Applying the Price Waterhouse framework to facts similar to those in the case at bar, the Second Circuit found that employment decisions based upon the stereotype that women cannot be both good mothers and good workers can constitute gender discrimination under Title VII. Back v. Hastings Union Free School District, 365 F.3d 107 (2nd Cir. 2004).[13] In Back, an elementary school psychologist was denied tenure and terminated after being subjected to numerous allegedly discriminatory comments including (a) inquiries about how she was “planning on spacing [her] offspring” and suggestions that she “wait until [her son] was in kindergarten to have another child,” (b) a request that she “not get pregnant until [her supervisor] retire[d],” and (c) statements that her supervisors “did not know how [she] could possibly do this job with children,” that she should “maybe . . . reconsider whether she could be a mother and do this job,” and that “because [she] was a young mother, [she] would not continue [her] commitment to the work place.”[14] Id. at 115. Citing to Price Waterhouse, the court held that the question of what constitutes a gender-based stereotype,
must be answered in the particular context in which it arises, and without undue formalization . . . Just as “it takes no special training to discern sex stereotyping in a description of an aggressive female employee as requiring a course at charm school,” so it takes no special training to discern stereotyping in the view that a woman cannot “be a good mother” and have a job that requires long hours, or in the statement that a mother who received tenure “would not show the same level of commitment [she] had shown because [she] had little ones at home.”
Id. at 120 (internal citation omitted). Such stereotyped statements, the court held, constitute evidence of gender discrimination. Id. See also Lynn v. Regents of the Univ. of Cal., 656 F.2d 1337, 1343 n.5 (9th Cir. 1981) (“When plaintiffs establish that decisions regarding . . . employment are motivated by discriminatory attitudes relating to race or sex, or are rooted in concepts which reflect such attitudes, however subtly, courts are obligated to afford the relief provided by Tide VII”).
Other circuits have adopted similar approaches to gender stereotyping in the context of pregnancy discrimination cases.[15] In Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 57 (1st Cir. 2000), the plaintiff, who had one child when she started working for the defendant and planned on having another, was subject to a number of comments by her supervisors “suggesting their concern about [her] possibly having a second child while working at Centennial, as well as concern about women with children working at Centennial in general.”[16] Santiago-Ramos was also “specifically questioned [about] whether she would be able to manage her work and family responsibilities.” The First Circuit found that stereotypical comments like these supported a finding of discriminatory animus based on pregnancy. See also Sheehan v. Donlen Corp., 173 F.3d 1039, 1044-45 (7th Cir. 1999) (holding, in a Pregnancy Discrimination Act *100 case, that a reasonable jury could have concluded that “a supervisor’s statement to a woman known to be pregnant that she was being fired so that she could ‘spend more time at home with her children’ reflected unlawful motivations because it invoked widely understood stereotypes the meaning of which is hard to mistake”); id. at 1044 (remarks by the head of plaintiffs department that “she would be happier at home with her children” provided direct evidence of discriminatoiy animus).
The full Commission of the MCAD has also recognized that employment decisions “based upon the stereotypical belief that women will become the primary caretaker for their children and will not be capable of performing their jobs after they many and have children” is actionable as sex discrimination under G.L.c. 151B. Ntapalis v. Halem & Schrader, P.C., 15 M.D.L.R. 1117, 1125 (1993).[17] In Ntapalis, a dentist, who was single at the time that she was hired, was told that her unmarried status was “a real plus for the facility” and that her employers believed that a “single employee would be more willing to put in long hours .. . and that a husband and family responsibilities would distract her from her work.” After Ntapalis got married, her managerial duties were taken away from her. While the MCAD acknowledged that “(m]arital status per se is not a protected category under Chapter 151B,” it determined that Ntapalis’s employer’s bias against marriage was based on gender stereotypes and therefore, constituted sex discrimination under c. 151B.
In light of these decisions, and the legislative directive that c. 15 IB be applied liberally,[18] the court finds that stereotypical remarks about the incompatibility of motherhood and employment can be evidence of gender discrimination. These types of statements reflect a discriminatoiy animus not towards parenthood, but towards women, based upon antiquated ideas about what a woman’s role in society should be. Basing employment decisions on such sex-based over-generalizations constitutes gender discrimination prohibited bye. 151B.
In the case at bar, Sivieri has alleged and put forth evidence that the DTA denied her promotions based upon her status as a mother of small children and the stereotypical belief that she could not be both a hard worker and a good mother. Accordingly, the plaintiff has set forth a prima facie case of sex discrimination under Chapter 15IB sufficient to survive a motion for summary judgment.
The DTA argues that Sivieri has not set forth a prima facie case of sex discrimination because she has failed to establish that male employees received promotions over her. It would blink reality to deny that a considerable part of our society believes that mothers are principally responsible for the care of young children and are therefore less effective as employees. Thus, “where stereotypes are considered, the notions that mothers are insufficiently devoted to work, and that work and motherhood are incompatible, are properly considered to be, themselves, gender-based.” Back, 365 F.3d at 121, citing Nev. Dep’t of Human Res. v. Hibbs, 538 U.S. 721, 728, n.5 (2003) (explicitly calling the stereotype that “women’s family duties trump those of the workplace” a “gender stereotype”). Obviously, gender discrimination is more blatant when it works to the advantage of male employees. However, discrimination against mothers is no less corrosive when that discrimination results in the advancement of another woman who is not a mother. But See Coleman v. B-G Maintenance Management of Colorado, Inc., 108 F.3d 1199, 1203 (10th Cir. 1997) (finding that discrimination against women with small children qualifies as “gender-plus” discrimination and that “gender-plus plaintiffs can never be successful if there is no corresponding subclass of the opposite gender”).[19]
III. Hostile Work Environment Sexual Harassment
Chapter 15IB makes it unlawful for any employer, personally or through its agents, to sexually harass an employee. G.L.c. 151B, §4(16A). The term “sexual harassment” is defined by the statute as “sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.” G.L.c. 151B, § 1 (18). There are two types of sexual harassment: (1) quid pro quo; and (2) hostile work environment. Sivieri has not alleged quid pro quo sexual harassment.[20]
Hostile work environment based sexual harassment exists when “sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature . . . have the purpose or effect of unreasonably interfering with an individual’s work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.” G.L.c. 151B, §1(18)(b). In order to prove such a hostile work environment, the plaintiff must establish that the alleged conduct was sufficiently severe and pervasive enough to interfere with a reasonable person’s work performance. See Muzzy v. Cahillane Motors, Inc., 434 Mass. 409, 411 (2001).
Sivieri has failed to set forth a claim for hostile work environment sexual harassment. She has not alleged that she was subjected to any sexual advances or requests or any physical or verbal conduct of a sexual nature.[21] Sivieri’s allegations, instead, relate only to her status as a mother with small children. Accordingly, Count II of the plaintiffs complaint must be dismissed.
ORDER
For the foregoing reasons, it is hereby ORDERED that the DTA’s Motion for Summary Judgment be ALLOWED as to Count I, as it pertains to incidents occurring prior to May 13, 2001, DENIED as to Count I, as it pertains to incidents occurring after May 13, 2001 and ALLOWED as to Count II.

 Sivieri has since withdrawn her claim for breach of contract.

 The facts are drawn from the plaintiffs complaint, the Affidavit of Lisa Sivieri, the Deposition of Lisa Sivieri, the Affidavit of Ann-Marie Locke, and the Affidavit of Leah Livingstone.

 The DTA singled Sivieri out for special projects and designated her to sit both on its Committee for Diversify Awareness (in 1998) and on its committee for the Performance Recognition Award (in 2000 and 2001). Sivieri received an award on account of her contribution to the Committee on Diversity Awareness.

While Sullivan had worked for the DTA for less than a year, she had worked as a paralegal with a personal injury law firm for more than thirteen years prior to moving over to the DTA. Sullivan has a bachelor’s degree but not a paralegal’s certificate.

Two other female employees with small children in the ADU, Leah Livingston and Ann Marie Locke, also noticed the unit’s negative attitude towards Sivieri and themselves and felt they were targeted for criticism. Locke stated that the attitude interfered with her ability to perform her job and made her dread going to work. She eventually quit her job with the DTA for those reasons.

 None of these positions were posted by the DTA and Sivieri did not apply for any of them. Sivieri contends, however, that she informed her supervisors that she was interested in staying at the DTA and progressing within the department. She further asserts that it is the policy of the DTA that once an employee has applied for a promotion, his or her supervisors are aware of his or her interest in advancing and it is not necessary to apply again.

 Another paralegal with small children, Leah Livingstone, who was also seeking a promotion, asserted in her affidavit that Graham told her that “once [her] responsibilities at home became a lot lighter, maybe there would be something else [she] could do at work,” or words to that effect.

 Specifically, Sivieri was frequently called into her supervisors’ offices and questioned with respect to the quality of her work, the sick time she took, her mileage requests, the time she took for lunch, and her attire.

 Sivieri’s MCAD charge states:
I have been working for DTA for approximately five years. Since I had my child approximately two years ago, I have been subjected to unequal terms and conditions by coworkers, especially in supervisory positions who do not have small children. I have been passed up for about three promotions. These promotions have gone to women without small children or no children at all. Each person has been there for a shorter amount of time than I have. The Assistant Director told me that she was surprised that I would want to take on more responsibility at work since I have so much responsibility at home and the two women who don’t have children can put in the extra hours at work. However, I was told at the same time that my work was pleasing. I am subjected to ongoing comments about small children. Jobs are created for employees without children and they are accommodated more often than employees with children. I feel that I have been subjected to unlawful discrimination because I am a female with a small child.

 The Legislature amended G.L.c. 151B, §5 in 2002, extending the limitations period from six months to 300 days. St. 2002, c. 223, § 1.

 Both federal decisions and the MCAD distinguish between two different varieties of continuing violations: “systemic” and “serial.” Ocean Spray Cranberries, Inc. v. Massachusetts Comm’n. Against Discrimination, 441 Mass. 632, 642, n.14 (2004). “A systemic violation is the maintenance of a general practice or policy aimed at members of a protected class of employees... By contrast, a serial violation is comprised of an interlinked succession of related events, stemming from a common discriminatory animus, with at least one act of harassment occurring within the limitations period.” Id. and cases cited.

 The record states only that Naugler was promoted in May of 2001 and Coloumbe was promoted in November of 2001. It does not specify any dates. For the purposes of this motion, the court assumes that these promotions occurred within the six-month period between May 13, 2001 and November 13, 2001. Even if Coloumbe’s promotion occurred after November 13, 2001, Sivieri’s claim relating to that promotion would be saved by the reasonable relation doctrine. “The reasonable relation doctrine operates to prevent an amendment from being time-barred if it is sufficiently connected to the [original MCAD] charge . ..” Davis v. Lucent Technologies, Inc., 251 F.3d 227, 233 (1st Cir. 2001); see also 804 Code Mass.Regs. § 1.10(6)(a) (“An amendment alleging additional acts constituting unlawful discriminatoiy practices related to or arising out of the subject matter of the original complaint may be made by Order of the Commissioner. Amendments shall relate back to the original filing date.”).

 The Back court found that the principle of Price Water-house “applies as much to the supposition that a woman will conform to a gender stereotype (and therefore will not, for example, be dedicated to her job), as to the supposition that a woman is unqualified for a position because she does not conform to a gender stereotype.” Back, 365 F.3d at 119.

 Back also alleged that her supervisors became hypercritical of her work, falsely accused her of misconduct, and removed positive letters from her file.

 Pregnancy discrimination is expressly prohibited by Title VII which categorizes employment decisions made “because of or on the basis of pregnancy, childbirth, or related medical conditions,” as decisions made “because of sex.” 42 U.S.C §2000e(k). Massachusetts courts have also recognized that differential treatment on the basis of pregnancy constitutes gender discrimination under G.L.c. 151B. See Massachusetts Elec. Co. v. Massachusetts Comm’n Against Discrimination, 375 Mass. 160, 167-68 (1978).

 One supervisor stated that “that he preferred unmarried, childless women because they would give 150% to the job.” Another asked Santiago-Ramos whether it was possible for her to handle simultaneously her job, childcare, and marital responsibilities. Several times, he questioned how her husband was managing, considering she was not home to cook for him. Two weeks before she was dismissed Santiago-Ramos was asked how well her work was proceeding in light of her child. She responded that her work was going well and that she planned to have a second child within several years. Mayberry stated that having another child was a lot of work, and he questioned whether Santiago-Ramos could perform her job effectively after having a second child. She responded that she would be able to meet both work and family obligations.

 Massachusetts courts afford deference to MCAD policies and decisions because of “the express delegation of authority by the Legislature in G.L.c. 151B, §2, empowering the MCAD to act forcefully to implement the statute in order to eliminate discrimination at root level.” Cuddyer, 343 Mass. at 536.

 Under G.L.c. 151B, §9, Chapter 151B “shall be construed liberally for the accomplishment of its purposes . . .”

 The DTA also argues that Sivieri has failed to establish a prima facie case of sex discrimination because she did not apply for any of the promotions that occurred after July 1999. However, none of these jobs were posted and Sivieri and another DTA employee have stated in their affidavits that it is the policy of the DTA that once an employee has applied for *102 a promotion, his or her supervisors are aware of his or her interest in advancing and it is not necessary to apply again. Furthermore, the DTA’s failure to post the jobs could be evidence of discriminatory animus if, as Sivieri contends, the DTA did not post the jobs in order to keep Sivieri unaware of their availability.

 Quid pro quo sexual harassment involves “sexual advances, requests for favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions.” G.L.c. 151B, §1(18).

 When asked in her deposition if any of the comments or conduct directed at her was of a sexual nature, Sivieri replied, “No.”